RICK SANTELLA, Indiv. and Derivatively, as a Shareholder of Food Groupie, Inc., Plaintiff-Appellee, v. WILLIAM KOLTON *et al.*, Defendants-Appellants.

First District (6th Division)   Nos. 1—08—1329, 1—08—1357, 1—08—1847 cons.

Opinion filed July 31, 2009.

David S. Klevatt, Timothy M. Howe, Laura Parry, and Alexis A. Bettis, all of Klevatt & Associates, LLC, of Chicago, for appellants.

Alan J. Mandel, of Alan J. Mandel, Ltd., of Skokie, for appellee.

JUSTICE JOSEPH GORDON delivered the opinion of the court:

This matter arises from an order of the circuit court granting relief to plaintiff, Rick Santella, and against defendants William and Mary Kolton, under section 12.56 of the Business Corporation Act of 1983 (805 ILCS 5/12.56 (West 2006)). For the reasons that follow, we dismiss.

## I. BACKGROUND

On October 31, 2005, plaintiff Rick Santella, a shareholder of an Illinois close corporation called Food Groupie, Incorporated, filed a verified complaint seeking declaratory, injunctive, statutory, and monetary relief from the two other shareholders of the corporation, defendants William and Mary Kolton. Mary Kolton is plaintiff's sister. According to plaintiff's complaint, Food Groupie was founded in 1987 and "sells and markets the use of copyrighted, design patented and trademarked anthropomorphic food characters and educational products promoting and focusing on healthy eating choices by highlighting the five food groups with positive images." Plaintiff asserts that the anthropomorphic food characters, which together are known as the "Food Groupies," were designed by the collective efforts of the Santella family. A corporation was formed to market products featuring the characters by plaintiff, defendants, and another member of the family, Ron Santella, with plaintiff holding a 35% ownership interest in the corporation, Mary and William Kolton each holding 25% interests, and Ron Santella holding a 15% interest. All four individuals were named directors of the corporation and plaintiff invested capital into the business. According to the complaint, the ownership interests in the corporation changed on May 1, 1988, when plaintiff purchased Ron Santella's 15% interest (giving plaintiff a 50% interest). Ron remained as a director of the corporation until 2003. Plaintiff alleged that on May 20, 1988, he subsequently transferred to Mary a 1% ownership interest with the understanding that William would transfer his interest to his wife, giving her a combined 51% interest. Plaintiff contends that he transferred this share based on Mary's representation that Food Groupie would be more successful if it was known as a female-owned company. In exchange for this stock transfer, plaintiff claims that the parties executed an agreement requiring unanimity of all shareholders for all company decisions.

Plaintiff claims that the parties carried on the business and complied with the shareholder agreement from 1988 until mid-2002. According to the complaint, Food Groupie sold an average of $350,000

worth of goods each year between 1993 and 2001, except for 1998, when the company sold $579,000 worth of goods. Plaintiff contends that the company made a profit every year between 1992 and 2001 and the compensation of the three shareholders was unanimously approved at annual "profitability projection and compensation" meetings.

On November 15, 2002, however, plaintiff alleges that defendants held a purported "Board of Directors meeting," without providing notice to plaintiff and his brother, Ron. At that meeting, which plaintiff and Ron did not attend, defendants voted to provide themselves with bonuses, salary increases, and contributions from company funds to their 401(k) plans. Plaintiff asserts that defendants appropriated $243,000 from Food Groupie, or 45% of the $545,000 in gross company sales for 2002, even though the company only made $15,000 in profit. In 2003, according to the complaint, defendants gave themselves, without the approval of plaintiff or Ron, salaries in the amount of $73,000 each and contributions to their 401(k) plans in the amount of $20,000, despite that fact that Food Groupie only made a $10,000 profit after selling $459,000 in goods that year. In 2004, again without the approval of plaintiff and Ron, defendants gave themselves $300,000 in salary and a $45,000 contribution to their 401(k) account even though the company made only $31,000 in profits after selling $729,000 worth of goods. Plaintiff alleges that he received no dividend from the corporation in 2002 and 2003 and received a dividend of only $1,470 in 2004. He contends that under the shareholder agreement, he was entitled to $28,808, 49% of the cumulative profits earned by the corporation in the collective years 2002, 2003, and 2004.

Plaintiff alleges that he learned of defendants' board meeting and 2002 compensation in 2003 and confronted his sister, Mary, on the matter. Plaintiff avers that in response, Mary sent him a letter stating her desire for him to leave the corporation and requesting from him a price quote at which he would sell his interests. Plaintiff contends that Mary subsequently refused his offers to participate in the company's affairs, stating that she was only interested in buying his interest, and that he was, in effect, "frozen out of the company's affairs." Plaintiff alleges that defendants changed the locks on the company's office to prevent him from entering.

Plaintiff also asserts that Mary usurped the corporation's intellectual property by trademarking the Food Groupie characters in her own name, without his consent, even though the characters belonged to the corporation. The complaint contends that Mary improperly entered into a "Licensing Agreement" with the corporation in which

she purported to license the rights to manufacture 26 different patents and copyrights to the corporation in exchange of an annual licensing fee. Plaintiff further alleged that on November 23, 2004, defendants held a shareholder meeting, during which they voted to remove him as a director of the company and replace him with William's brother, Anthony.

In count I of the complaint, alleging breach of contract, plaintiff alleges that defendants breached the shareholders agreement by consistently entering into activities and initiatives on behalf of the corporation without his consent, which was required for all corporation actions under the shareholders agreement. These actions include paying themselves hundreds of thousands of dollars in purported salaries and benefits; holding director and shareholder meetings without him; transferring Food Groupies' intellectual property to Mary; entering into the licensing agreement with Mary for the right to use the Food Groupie characters; depriving him of access to the corporate office; removing him as a director and officer; depriving him of his share of corporate profits in 2002, 2003, and 2004; failing to conduct "annual profitability projection and compensation" meetings for the years 2002, 2003, and 2004; making unauthorized contributions to their 401(k) plan; failing to hire experienced sales representatives and implement a sales lead tracking system as he requested; preventing him from assisting the corporation's business; and creating corporate bylaws. Plaintiff alleges that these breaches deprived him of his share in the corporation's profits since 2001 and substantially diminished the value of his interest in the company.

In count II of the complaint, alleging breach of fiduciary duty, plaintiff alleges that defendants, as fellow shareholders in a close corporation, owed fiduciary duties to treat him with the utmost candor, care, loyalty, and good faith. He contends that they also owed him fiduciary duties to use Food Groupie assets only for the benefit of the corporation, not themselves, and to refrain from acts of self-dealing or misappropriation of business opportunities, corporate monies, and services or otherwise seek personal benefit at the expense of fellow shareholders. Plaintiff asserts that defendants breached these duties by diverting corporate funds to themselves; personally granting themselves benefits from intellectual property belonging to the corporation; improperly excluding plaintiff from corporate decision-making; depriving him of his share of corporate profits; granting themselves preferred treatment as shareholders by awarding themselves constructive dividends through the excessive salaries, bonuses, and corporate contributions to their 401(k) plans; engaging in oppres-

sive conduct against him by "freezing him out" of corporate affairs and denying him access to the corporate office and corporate records; and by submitting false corporate documents to the Illinois Secretary of State to his detriment.

In count III of the complaint, alleging usurpation of a corporate opportunity, plaintiff alleges that Mary improperly appropriated the Food Groupie trademarks in her own name rather than in the name of the corporation as the shareholders intended. In support of this claim, plaintiff contends that the characters where the fruit of a collaborative effort by all parties associated with the company and that Mary was never authorized to claim an interest in the intellectual property separate from that of the corporation and its shareholders. Plaintiff further asserts that Mary unlawfully concealed her efforts to claim the intellectual property for herself from the others, and exploited this corporate opportunity by entering into the "fraudulent" licensing agreement with the corporation pursuant to which she granted the corporation the right to manufacture and market Food Groupie products in exchange for a fee. Plaintiff prays for an injunction barring defendants from using the corporate intellectual property for their personal benefit or starting a competing business and judicial declarations that defendants have no personal right to the intellectual property, that the licensing agreement between Mary and the corporation was invalid, and that Mary is required to correct trademark filings with the government to list Food Groupie as the holder of the trademarks.

In count IV, entitled "Violations of the Illinois Business Corporations Act: Oppressive and Fraudulent Actions of the Defendants and Misappropriating of Corporate Funds and Services," plaintiff alleges that defendants oppressed him as a minority shareholder by "freezing" him out of the company. Plaintiff also asserts that defendants improperly used corporate funds to award themselves "outrageous" compensation and to hire a valuation expert and legal counsel in connection with their personal dispute with plaintiff. As his relief under count IV, plaintiff prayed for a court order: removing defendants as officers and directors of the corporation; appointing an interim custodian to manage and oversee the business and affairs pending final adjudication of the matter; appointing an independent custodian to oversee the day-to-day affairs of the company and determine appropriate employee deployment and compensation; appointing an independent accountant to perform an audit of the company's books and records to determine the full amount of monies misappropriated by defendants; appointing an independent valuation expert to determine the fair

market value of the company; terminating defendants' employment with the company and empowering a custodian to hire employees; reinstating both plaintiff and Ron Santella as directors of the corporation; voiding any indemnification from corporate funds defendants may have to utilize to pay for attorneys fees and other expenses associated with the action; requiring defendants to reimburse the corporation for time spent during working hours to defend the action; requiring defendants to reimburse the corporation for legal fees they spent in connection with their dispute with plaintiff; enjoining defendants from using corporate funds to pay attorneys fees; declaring as void the salary, bonus, and 401(k) contribution awards made by defendants to themselves without plaintiff's approval; awarding plaintiff the option to buy defendants' interests in the corporation; awarding plaintiff monetary relief; and declaring void the licensing agreement between Mary and the corporation.

On December 21, 2005, the circuit court entered an interim order appointing John Ashendon as a custodian of Food Groupie with the authority to "review all corporate disbursements" during the pendency of the litigation. From 2005 to February 2008, the litigation continued and Food Groupie continued to operate and make sales. On February 25, 2008, plaintiff filed an "Emergency motion for Imposition of Statutory Remedies to Enjoin Dissipation of Assets and for Immediate Accounting," seeking relief under section 12.56 of the Business Corporation Act of 1983 (805 ILCS 5/12.56 (West 2006)). In the motion, plaintiff restated the allegations made in his complaint that defendants had improperly distributed corporate funds to themselves between 2002 and 2005 and further alleged that between January 1, 2007, and February 1, 2008, the corporation paid defendants $200,000 and paid their attorneys more than $80,000 for their personal defense against plaintiff's action, and paid defendants' attorney $50,000 in advance retainers.

In support of his claim of mismanagement of corporate funds, plaintiff attached to his motion a summary of the financial statements of Food Groupie for the years 1997 to 2007 showing the gross sales of Food Groupie and the salaries and commissions earned by defendants in each of those years. This summary shows that although defendants together earned a total of $57,247 in commissions in the eight years of 1997 through 2004 while gross sales of Food Groupie were improving, they earned $144,091 in commissions in the three years of 2005, 2006, and 2007, as gross sales were declining. The summary also shows that in 2005, 2006, and 2007, defendants made $85,000 each in salary. The statement specifically provided, in relevant part:

|      | Gross Sales | Mary's salary | Bill's Salary | Commissions to Mary and Bill |
|------|-------------|---------------|---------------|------------------------------|
| 1997 | $389,905    | $33,600       | $33,600       | $10,325                      |
| 1998 | $579,889    | $56,000       | $56,000       | $7,918                       |
| 1999 | $345,966    | $42,000       | $42,000       | $7,365                       |
| 2000 | $335,029    | $45,000       | $45,000       | $6,751                       |
| 2001 | $390,609    | $47,500       | $47,500       | $6,273                       |
| 2002 | $545,882    | $100,000      | $100,000      | $6,700                       |
| 2003 | $479,941    | $72,500       | $72,500       | $5,813                       |
| 2004 | $729,369    | $145,000      | $145,000      | $6,102                       |
| 2005 | $707,767    | $85,000       | $85,000       | $61,976                      |
| 2006 | $532,378    | $85,000       | $85,000       | $33,704                      |
| 2007 | $437,413    | $85,000       | $85,000       | $48,339.                     |

Plaintiff further contended that the custodian, Ashenden, received a letter from Mary dated February 22, 2008, a copy of which was attached to the motion, stating her desire to liquidate the company due to "significant financial strain" on the company caused by the "negative impact of a down-trending target market because of federal and state budget cuts" and the ongoing litigation with plaintiff. In the letter, Mary also stated that the company's landlord had terminated the lease of the corporate office and that she was not renewing her license with the corporation granting it the right to use the intellectual property rights for the Food Groupie characters.

Plaintiff further asserted in the motion that defendants were forming another company called "Healthypalooza" to carry on the business of Food Groupie using the intellectual property of the corporation that was improperly registered in Mary's name alone, as soon as Food Groupie was liquidated. In support of this claim plaintiff attached to his motion an application submitted by defendants to trademark the word "Healthypalooza," for the purpose of marketing books and educational materials regarding healthy eating—the same activities engaged in by Food Groupie. Plaintiff also alleged that defendants had registered for Web sites to market Healthypalooza products.

In his motion, plaintiff also disputed Mary's claim in her letter to the custodian that the company needed to be liquidated due to financial problems. Plaintiff alleged that defendants had "abandoned the company as a going concern" despite its remaining financial viability. Plaintiff argued that there had been a consistent demand for Food Groupie products for the previous 10 years and noted that the federal government had recently approved a $500 million increase to

fund Head Start programs, which form a large customer base for the corporation, and a private foundation had recently announced a $500 million program to fund obesity prevention programs.

In the motion, plaintiff prayed for the court to:

> "enter an Order pursuant to Sections 12.56 and 12.60 of the Business Corporations Act to remove William and Mary Kolton as directors and officers of Food Groupie, Inc., to appoint Mr. Santella as an officer, to appoint such other persons as officers and/or directors as this Court may deem appropriate, to compel William and Mary Kolton to provide an immediate accounting of all income and expenses from January 1, 2007 forward, to enjoin William and Mary Kolton from making any use of any asset of Food Groupie, Inc or from soliciting customers of Food Groupie, Inc for sales and for such other and further relief as this Court deems just."

The motion does not provide for a time limitation for any of these remedies.

On March 12, 2008, defendants filed a response to plaintiff's emergency motion. In that pleading, defendants asserted that the corporation's financial situation was "dire" as a result of deteriorating market conditions and the costs associated with defending the company against plaintiff's lawsuit, which they assert is not attributable to any alleged improper activity by defendants. Defendants contended that plaintiff failed to provide any proof of wrongdoing on their part. In their response, defendants also claimed that they would always disagree with plaintiff as to the future of the company but, because of plaintiff's 49% share, they could not attain the approval of 66% of the shareholders necessary under the bylaws to voluntarily dissolve the corporation. Because of this deadlock, together with the dire financial condition of the company, defendants asserted that judicial dissolution of the corporation was required under section 12.56(b)(12) of the Business Corporations Act (805 ILCS 5/12.56(b)(12) (West 2006)).

On March 31, 2008, the circuit court apparently held a status hearing on plaintiff's emergency motion and that day entered an order stating "[b]ased on the Court's finding that there exists a shareholder deadlock, the Court shall conduct an evidentiary hearing *** to determine what, if any, remedies shall be ordered pursuant to §12.56 of the IL Business Corporation Act." The order also required the parties to disclose witnesses to one another and complete the depositions of the parties.

An evidentiary hearing was held on the matter on April 7, 8, 9, and 10, 2008, at which plaintiff and both defendants testified. Although plaintiff's counsel referred to the statutory remedies sought

by plaintiff as "interim remedies," he provided no indication as to the temporal reach of the remedies he was seeking on behalf of his client.

On April 23, 2008, the court entered an oral ruling on plaintiff's motion. The court began its ruling by explaining that "[b]oth sides agree that the remedies under the Business Corporation Act, section 12.56, are appropriate," although defendants sought dissolution under that section and plaintiff sought the removal of defendants as directors and officers, the setting aside of certain commissions, salaries, and legal expenses paid to defendants by the corporation. The court then noted that dissolution was only appropriate under section 12.56 in the event that none of the other remedies articulated in that statute were sufficient to resolve the matters in dispute and denied defendants' request to dissolve the corporation. The court stated that although the market for Food Groupies' products may have declined, the evidence showed that the corporation had a good product, owed no debt to third parties, sold $400,000 worth of products in the previous year without advertising, and that defendants had "lost the will and the drive to carry and [sic] this company." The court also noted that it appeared that defendants wanted to carry on a similar company in Healthy-palooza despite their incredible claims that they had no future career plans. Although the court found the defendants' legal expenses and salaries to be reasonable, it found the $144,019 worth of commissions paid to defendants by the corporation in 2005, 2006, and 2007 constituted corporate mismanagement in light of contemporaneous declining sales and were "actually just a way to make up what *** defendants perceived to be a shortfall in their salaries." The court then ordered that defendants be removed as directors and officers of Food Groupie, to be subsequently replaced by court order, and set aside the $144,019 in commissions earned by defendants in 2005, 2006, and 2007. The order did not state that these remedies had limited temporal scope.

In a written order entered on April 23, 2008, the circuit court denied defendants' request for judicial liquidation but granted plaintiff's requests that defendants be removed as officers and directors of Food Groupie and that the powers of the corporation custodian, Ashenden, be expanded to enable him to make all necessary day-to-day decisions of the company until May 1, 2008, and aid in the transfer of the corporate control to the new officers and directors. The court also found that "there was corporate mismanagement with respect to the payment of commissions to William and Mary Kolton in 2005, 2006, and 2007," set aside the corporate approval of $144,019 of commissions paid to defendants in those years, and issued a mandatory injunction pursuant to sections 12.56 and 12.60 of the Business

Corporation Act compelling defendants to return the $144,019 to the corporation without setting a deadline date by which such payment was to be made. The court concluded, however, that salaries paid to defendants by the corporation and legal expenses paid on their behalf did not constitute corporate waste or mismanagement. The order did not state that any of these remedies were interlocutory or otherwise term limited. On July 3, 2008, the court appointed two directors to replace defendants on the board of Food Groupie.

On May 22, 2008, defendants filed a notice of interlocutory appeal in this matter pursuant to Supreme Court Rule 307(a) (188 Ill. 2d R. 307(a)). Defendants did not file a motion to stay the April 23, 2008, order and did not comply with the court order enjoining them to pay $144,019 back to the corporation. On November 21, 2008, pursuant to a petition of plaintiff for rule to show cause why defendants should not be held in contempt for failure to comply with the court order requiring them to pay $144,019 back to the corporation, the court found defendants to be in indirect civil contempt and further ordered that defendants pay $200 each for every day they remained in contempt after December 6, 2008. During the hearing on the petition, the circuit court expressly stated that its order requiring defendants to pay $144,019 back to the corporation was a mandatory injunction, explaining, "we're not preserving the status quo; we're ordering somebody to do something."

While this matter was pending before this court on appeal, we granted plaintiff leave to supplement the appellate record to reflect that on February 10, 2009, defendants paid the $144,019, which they were mandated to pay, but "were in contempt for failure to pay the $144,019 from November 21, 2009 through February 10, 2009." At oral argument, plaintiff again conceded that defendants paid the $144,019, but represented to this court that defendants had not yet paid the approximately $20,000 in fines that they incurred by remaining in contempt for failure to pay the $144,019 between December 6, 2008, and February 10, 2009, and that the contempt order had not been vacated by the circuit court. Defendants also acknowledged that the parties were preparing to proceed with the trial on plaintiff's remaining claims for declaratory judgment and breach of fiduciary duty in the summer of 2009.

## II. ANALYSIS

On appeal, defendants contend that the circuit court erred in removing them as directors and officers of Food Groupie, replacing them with new directors, setting aside the corporate actions paying them $144,019 in commissions for sales completed in 2005, 2006, and

2007, and entering a mandatory injunction requiring them to pay that money back to the corporation. They assert that the relief granted to plaintiff was not supported by sufficient evidence or proof. Defendants specifically note that section 12.56 is governed by section 12.60(a) of the Act (805 ILCS 5/12.60(a) (West 2006)), which states that "[t]he practice in actions under Section *** 12.56 shall be the same as in other civil actions except as may be otherwise provided in this Act," and argue that the burden of proof borne by a claimant seeking a particular remedy under section 12.56 is identical to that burden that would be required to obtain that remedy in a general civil action brought outside the Act. Accordingly, defendants argue that in order to have defendants' $144,019 in commissions set aside, plaintiff was required to establish breach of fiduciary duty or commission of corporate waste or fraudulent or illegal activity, proof required for such actions under the common law. Because the circuit court did not find that defendants committed such improper conduct, defendants argue that the circuit court's invalidation of their earned commissions must be reversed.

As to the circuit court's issuance of a mandatory injunction requiring defendants to pay $144,019, which they received in commissions, back to the corporation, defendants similarly argue that the order must be reversed because the court failed to make the requisite supportive findings necessary to impose a preliminary injunction under common law. As to the order removing defendants as officers and directors, defendants assert that plaintiff was required to prove by clear and convincing evidence that defendants engaged in fraudulent or dishonest conduct or grossly abused their positions to the detriment of the corporation and that their removal was in the best interest of the corporation, the standard required under section 8.35(b) of the Business Corporation Act (805 ILCS 5/8.35(b) (West 2006) (Court may remove director of corporation from office upon petition of shareholders upon finding that "(1) the director is engaged in fraudulent or dishonest conduct or has grossly abused his or her position to the detriment of the corporation, and (2) removal is in the best interest of the corporation")). Defendants also assert that plaintiff's general claims of mismanagement were unproven and that the corporation decisions which serve as the basis of his claim, such as failure to advertise and restock inventory, were protected by the business judgment rule in any event. Defendants also argue that the court erred in appointing replacement directors because defendants' removal from office was in error.

In response, plaintiff argues that the order of the circuit court should be affirmed. He first asserts that this court lacks jurisdiction to

consider two of defendants' three claims on appeal, namely, their claims that the court erred in removing defendants as directors and officers and in appointing replacement directors and officers. In support, plaintiff notes that defendants filed their appeal pursuant to Supreme Court Rule 307(a)(1), which applies to orders "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction" (188 Ill. 2d R. 307(a)(1)), and he argues that the orders removing and replacing the directors and officers do not fall within the scope of this rule because they do not constitute injunctions.

Plaintiff further asserts that defendants lack standing to bring this appeal from any portions of the judgment below under the established precedent of appellate courts to refuse to hear appeals from those parties who are in contempt of the circuit court below for failure to comply with its orders. See *Wick v. Wick*, 19 Ill. 2d 457, 460, 167 N.E.2d 207, 209 (1960) ("Consideration is not ordinarily given to one who shows his contempt for the courts at the same time that he asks their affirmative assistance"). He notes that defendants were found to be in contempt for failure to pay $144,019 back to the corporation as was required under the circuit court's April 23, 2008, order. Although at oral argument it was disclosed that defendants did subsequently, after the filing of the notice of appeal, pay the $144,019, plaintiff nevertheless argues that defendants still lack standing to prosecute this appeal because they have failed to fully satisfy the contempt order by paying the approximately $20,000 in fees imposed by the court for their delay in complying with the injunction order. The record does not indicate whether the circuit court has entered any subsequent orders with respect to these unpaid sanctions.

As to the merits of defendants' claims, plaintiff first asserts that defendants have waived the right to contest the circuit court's imposition of alternate section 12.56 remedies because defendants themselves prayed for relief pursuant to section 12.56, namely, judicial dissolution, contending that deadlock existed among the directors. Plaintiff argues that because defendants conceded the applicability of section 12.56 to afford the remedy of dissolution, the most severe remedy available under that section (see 805 ILCS 5/12.56(b)(12) (West 2006) (court may only dissolve corporation pursuant to section 12.56 if it concludes that no other statutory remedy or alternative remedy is sufficient to "resolve the matters in dispute")), they cannot now complain that the court granted "gentler" relief under section 12.56.

Plaintiff next argues that the circuit court's order was fully consistent with section 12.56 and was supported by the evidence. Plaintiff notes that under section 12.56, any of the remedies listed, including the removal and replacement of officers and directors and

the setting aside of corporate actions, may be granted if the claimant establishes that the "corporation's assets were being misapplied or wasted" by the officers and directors. 805 ILCS 5/12.56(a)(4) (West 2006). He notes that the court's finding that the defendants misman- aged the company was supported by the evidence presented that defendants improperly gave themselves commissions, failed to replen- ish the corporation's inventory or advertise the goods, and attempted to start another company with Food Groupies' intellectual property.

&#9646; Before analyzing and evaluating the merits of defendants' substantive arguments on appeal, this court must first determine whether it has subject matter jurisdiction to do so. *Artoe v. Illinois Bell Telephone Co.*, 26 Ill. App. 3d 483, 484, 325 N.E.2d 698, 699 (1975) ("Before considering the appeal on the merits, it is our duty first to determine that the appeal has been properly taken so as to invoke our jurisdiction"). On this point, we note that defendants have brought the instant appeal pursuant to Supreme Court Rule 307(a)(1), which allows this court to consider appeals from interlocutory orders entered by the circuit court "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." 188 Ill. 2d R. 307(a)(1). Thus, we must determine whether each aspect of the circuit court's order appealed by defendants is subject to review under Rule 307(a)(1). If it is not, then we must determine whether any such issue is otherwise subject to review.

As noted above, Rule 307(a)(1) applies to interlocutory orders "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction" 188 Ill. 2d R. 307(a)(1). Thus, the applicability of Rule 307(a)(1) turns in part on whether each of the actions of the circuit court removing defendants as officers and directors, appointing new directors, invalidating commissions paid to them, and ordering them to return that money to the corporation constituted "injunctive relief" for purposes of that rule. When determining whether an order "constitutes an appealable injunctive order under Rule 307(a)(1) we look to the substance of the action, not its form." *In re A Minor*, 127 Ill. 2d 247, 260, 537 N.E.2d 292, 297 (1989). "Actions of the circuit court having the force and effect of injunctions are appealable even if labeled as something else." *Hamilton v. Williams*, 237 Ill. App. 3d 765, 776, 604 N.E.2d 470, 478 (1992). An injunction has been defined by the Illinois Supreme Court as a " 'judicial process operating in personam and requiring [a] person to whom it is directed to do or refrain from doing a particular thing' " (*In re A Minor*, 127 Ill. 2d at 261, 537 N.E.2d at 298, quoting Black's Law Dictionary 705 (5th ed. 1983)) or " 'a judicial process, by which a party is required to do a

particular thing, or to refrain from doing a particular thing, according to the exigency of the writ, the most common sort of which operate as a restraint upon the party in the exercise of his real or supposed rights' " (*In re A Minor*, 127 Ill. 2d at 261, 537 N.E.2d at 298, quoting *Wangelin v. Goe*, 50 Ill. 459, 463 (1869)).

In the case at bar, only one of the circuit court's actions was injunctive and was in fact so labeled, namely, the mandatory injunction setting aside the $144,019 in commission payments made by the corporation to defendants and ordering defendants to pay $144,019 back to the corporation. As characterized in *In re A Minor*, this action was a judicial process operating to require defendants to do "a particular thing" and thus constituted an "injunction" for purposes of Rule 307(a)(1). *In re A Minor*, 127 Ill. 2d at 261, 537 N.E.2d at 298.

The other circuit court actions, namely, the removal of defendants as directors and officers of Food Groupie and the appointment of replacement directors and officers, were not injunctive in nature and thus do not fall within the scope of Rule 307(a)(1). None of these actions required defendants to do or refrain from doing "a particular thing" and thus did not fall within our supreme court's definition of an injunction. *In re A Minor*, 127 Ill. 2d at 261, 537 N.E.2d at 298, quoting *Wangelin*, 50 Ill. at 463 (injunction defined as " 'a judicial process, by which a party is required to do a particular thing, or to refrain from doing a particular thing' "). Nor do these orders operate *in personam*, as an injunction would. See *In re A Minor*, 127 Ill. 2d at 261, 537 N.E.2d at 298, quoting Black's Law Dictionary 705 (5th ed. 1983) (an injunction is a " 'judicial process operating *in personam*' "). Instead of binding defendants personally, the removal and replacement of the directors and officers were statutory remedies which operate to change the legal status of the corporate positions occupied by defendants. See 10 W. Fletcher, Private Corporations 263 (2001) (injunction cannot be used to effect removal of directors of corporation); see generally 43A C.J.S. *Injunction* §191, at 220 (2004) ("Injunction is not the proper remedy for the removal of an officer of a private corporation"). Indeed, defendants do not attempt to argue that the removal and replacement of defendants as directors and officers constituted injunctive actions, but instead premise their jurisdictional claim under Rule 307(a)(1) on the mandatory injunction requiring them to return the $144,019 in commissions. Thus, because the remedies were not "injunctions" as required under Rule 307(a)(1), we have no jurisdiction under that rule to consider the merits of defendants' claims that the court erred in removing and replacing them as directors and officers. *In re A Minor*, 127 Ill. 2d at 261, 537 N.E.2d at 297.

Although plaintiff only challenges our jurisdiction under Rule 307(a)(1) to consider the circuit court orders removing and replacing defendants as directors and officers, we must also consider whether we have jurisdiction to consider the propriety of the court's order mandating that defendants pay $144,019 back to the corporation. *Artoe*, 26 Ill. App. 3d at 484. Although this relief was injunctive, it will not be subject to review under Rule 307(a)(1) unless it was interlocutory, not permanent, in nature. Rule 307(a)(1) applies only to interlocutory injunction orders that merely preserve the status quo pending a decision on the merits, conclude no rights, and are limited in duration, in no case extending beyond the conclusion of the action. *Steel City Bank v. Village of Orland Hills*, 224 Ill. App. 3d 412, 416, 586 N.E.2d 625, 628 (1991). Rule 307(a)(1), however, does not apply to permanent orders, which are orders that are not limited in duration and alter the status quo. *Steel City Bank*, 224 Ill. App. 3d at 417, 586 N.E.2d at 628; accord *Smith v. Goldstick*, 110 Ill. App. 3d 431, 438, 442 N.E.2d 551, 557 (1982) (defining an "interlocutory injunction" as an order "granted to preserve the status quo pending a decision on the merits" that concludes no rights and takes the form of "either preliminary injunctions or temporary restraining orders which are limited in duration and in no case extending beyond the conclusion of the action" and holding that the orders entered in that case were not appealable under Rule 307(a)(1) because the orders were "not limited in their duration, nor [did] they merely preserve the status quo; rather, by them defendant is permanently deprived of his right to occupy the law offices, and they are more in the nature of final orders disposing of an issue between the parties"). Such orders constitute final orders and are only appealable under Rule 301 or 304(a), if those rules are otherwise applicable. *Steel City Bank*, 224 Ill. App. 3d at 416, 586 N.E.2d at 628.

The court's order requiring defendants to pay $144,019 back to the corporation was a permanent order not subject to review under Rule 307(a)(1). The permanency of the order is evidenced by the fact that it altered the status quo, concluded the rights of the parties, and was not limited in duration. *Steel City Bank*, 224 Ill. App. 3d at 416, 586 N.E.2d at 628. We first note that during the contempt hearing, the circuit court expressly stated that its order requiring the return of the $144,019 was not intended to preserve the status quo, stating, "we're not preserving the status quo."

Next, we observe that the court reached conclusions regarding the rights of the parties in its April 23, 2008, order. The order was entered after an extensive, four-day evidentiary hearing scheduled by the

court in an order entered on May 31, 2008, to "determine what, if any, remedies shall be ordered pursuant to §12.56 of the IL Business Corporation Act" in light of the court's finding that "there exists a shareholder deadlock." Indeed, we observe that the hearing was called, in part, to determine the appropriateness of judicial dissolution of Food Groupie, a remedy prayed for by defendants that could not be described as temporary or interlocutory in nature. In entering the April 23, 2008, order, the circuit court appears to have decided the merits of plaintiff's claim for statutory remedies, count IV of his complaint, and determined that plaintiff, as a shareholder, was entitled to have corporation actions granting defendants' commissions set aside and to receive an injunction ordering defendants to transfer $144,019 back to the company. This conclusion is bolstered by the representation of defendants' counsel that the parties are proceeding to trial on the other counts of plaintiff's complaint, namely, his claims for declaratory judgment and breach of fiduciary duty, in the summer of 2009, simultaneously to the pendency of this appeal.

We note that the terms of the order to pay money back to the corporation provided no limitation to the order's duration. Indeed, in the court's written ruling, the court stated that the money was to be "used in a manner as determined by the Custodian and Anthony Kolton and/or the new officers and directors once appointed." Plaintiff also explained in his appellate brief that the payment was intended to "re-infuse the corporation with *** fresh operating capital so that it could continue as a going concern." These statements indicate that the money was going to be spent and in no event would it be returned to defendants if they prevailed on the merits of plaintiff's other claims.

Therefore, we are compelled to conclude that defendants' right to appeal does not lie under Rule 307(a)(1). Because the order did not constitute a final adjudication under Rule 301 since counts I, II, and III still remain pending (see 155 Ill. 2d R. 301 (granting party right to appeal from final judgments of the circuit court)) and the order contains no language pursuant to Rule 304(a) that no just reason exists to delay our consideration of the appeal (see 210 Ill. 2d R. 304(a) ("If *** multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the *** claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both")), we do not have the jurisdiction to consider the merits of defendants' claims on appeal. We note, finally, that our jurisdictional ruling would not preclude appellant from now seeking

such a Rule 304(a) finding from the trial court. Accordingly, this appeal is dismissed at this time for lack of subject matter jurisdiction.

Dismissed.

O'MALLEY, P.J., and CAHILL, J., concur.